BARTON WRIGHT *against* TIMOTHY O'BRIEN.

Plaintiff employed A., an artist, to copy, in crayon, from a small photograph, a
   likeness of his child, and on making the contract, made him a payment on ac-
   count.  After the copy had been partially made, plaintiff made an arrangement
   with A., by which he agreed to pay him a certain sum for the work done, and
   A. agreed to deliver the picture to B. to be finished.  *Held*, that on the making
   of this latter agreement, the property in the picture passed to plaintiff, and
   that he could recover the possession of it from a marshal who levied on it under
   an execution against A. after the agreement was made, and before the payment
   of the money.

*It seems*, that the ownership of a picture painted to order, is always in the person
   giving the order, and that the artist only has a lien on it for the value or price
   of his services.  Per ROBINSON, J.

APPEAL by defendant from a judgment of the general term
of the Marine Court affirming a judgment of that court entered
after a trial before a judge without a jury.

The action was brought to recover the possession of a
crayon portrait which it was alleged the defendant had unlaw-
fully taken and detained.

The defendant acknowledged the taking, but justified in
that he was a marshal of the city of New York, and took it
by virtue of an execution issued to him against the property of
Richard Rogers, to whom the portrait belonged.

On the trial the following facts appeared :

The plaintiff, through his agent, made a contract with an
artist named Rogers, to copy in crayon, from a small photo-
graph, a likeness of the plaintiff's deceased child.  For this
work, when the copy was made, the plaintiff was to pay a speci-
fied sum, twenty-five dollars of which was paid by the agent to
Rogers, when he was employed.  About two months after-
wards, when the copy was nearly completed, Rogers sent a
note to the agent advising him that he was about to sail for
Europe, and asking him to make a further payment.  The
agent then had an interview with Rogers, when it appeared
that there was a misunderstanding as to the amount to be paid,

the agent being under the impression that it was $75, and Rogers claiming that it was $100. Rogers informed him that a Mr. Simms, an artist who was present, would finish the copy upon the payment to him, by the plaintiff, of $20, and Simms thereupon agreed to do so. Rogers then required the agent to pay him $55 more before the picture went into Simms' hands, to which the agent objected, and the interview terminated, leaving the question of the amount to be paid to Rogers, in dispute. Simms took the photograph from which the copy was to be made, with him ; but the crayon copy, in the state in which it was, was left with Rogers.

The next day, at about 10 o'clock in the morning, the agent met Rogers, pursuant to an appointment, which was followed by Rogers sending him that day a receipt for $80, upon receiving which the agent paid the person who brought the receipt the $55. This payment was made, according to the evidence, ten minutes before or ten minutes after one o'clock. At fifteen minutes before one o'clock the picture was taken by the defendant, under an execution against Rogers.

The plaintiff had judgment, which was affirmed by the general term of the Marine Court, whereupon this appeal was taken.

*Roscoe H. Channing*, for appellant.

*Arnoux, Ritch & Woodford*, for respondent.

DALY, Chief Justice.—The question presented is whether the picture, under the circumstances, was, at the time of its seizure by the defendant, the property of Rogers, and could, as such, be seized and sold under an execution against him.

This was not a contract for the sale and delivery of goods, wares and merchandises, in which both delivery and acceptance are essential to the validity of the contract under the statute of frauds. It was the employment of an artist to copy in crayons, a photograph, for which he was to be paid a specified sum—an agreement for the performance of work and labor, in which almost the sole ingredient was his labor and skill ;

the materials, which consisted of the canvass upon which the work was executed and the crayon pencils with which it was done, being unimportant, and merely ancillary to his contract for skill, work and labor (*The Passaic Manuf. Co.* v. *Hoffman*, 3 Daly, 495). It was an article, moreover (a portrait of the plaintiff's child), which could be of little value to any one but the plaintiff himself, and was never intended to be the subject of sale and purchase; it was a kind of property so interwoven with family ties and affections, that it is, under our laws, exempt from levy and sale under execution. It is, however, unnecessary to dwell upon the peculiar nature of the article, as the judgment of the Marine Court can, upon the authority of adjudged cases, be sustained upon a distinct and independent ground.

Where a party orders a thing to be made, such as a vessel or any other article, it does not become his property until is is delivered into his possession, even though he may have paid for it in advance, or furnished a large portion of the materials of which it is constructed; but during its production it is, and after it is finished it continues to be, up to its delivery, the property of the person who produced it, and may be levied upon and sold under an execution against him (*Muckles* v· *Mangles*, 1 Taunt. 318; *Merritt* v. *Johnson*, 7 Johns. 473; *Johnson* v. *Hunt*, 11 Wend. 139; *Andrews* v. *Durant*, 11 N. Y. 35). But, whilst this is the rule, it is equally well settled that it is competent for the parties to agree that the thing to be produced, from the beginning, or at any stage of its production, is to be the property of the person who ordered it, and that where a mutual assent to that effect is shown by unequivocal acts or declarations, the title passes before delivery (*Wood* v. *Russell*, 5 B. & Ald. 942; *Rhode* v. *Thwaits*, 6 Id. 388; *Atkinson* v. *Bell*, 8 Id. 277; *Jackson* v. *Anderson*, 4 Wend. 474; *Whitehouse* v. *Frost*, 12 East, 614; *Kimberly* v. *Patchin*, 19 N. Y. 333; *Olyphant* v. *Baker*, 5 Den. 383, 384; *Andrews* v. *Durant*, 11 N. Y. 42, 45). "It is," said Denio, J., in the last of these cases (*Andrews* v. *Durant*), "no doubt competent for the parties to agree when and upon what conditions the property in the subject of such a contract, shall

vest in the prospective owner," and the question in that case, which was simply one of construction, was whether the parties intended that the property in an unfinished barge, should, when the first payment was made, vest in the persons who ordered it to be built, and should thereafter be at their risk as to casualties. "Such an agreement," said Judge Denio, "would be lawful if made, and the doubt only is whether the parties have so contracted;" the final conclusion of the court being that the contract would not bear that construction.

In the present case, Rogers could not finish the copy, as he was about to sail for Europe. He wrote to that effect to the agent, and wished him to make a payment on it. The agent went to see Rogers, and as he says, made a *specific arrangement* with him, which he declares was this : that the picture was to be delivered to Mr. Simms, an artist in the employ of Mr. Sarony; that Simms was to finish it for $20, to be paid by the plaintiff; that Rogers told Simms, who was present, to take the picture on the condition that the agent would pay him the $20 when it was completed, and that Simms consented to the arrangement between Rogers and the agent. All this then was arranged by the united assent of Rogers, Simms and the plaintiff's agent. A point of difference, however, arose between Rogers and the agent, as to the price which was originally to be paid for the work ; Simms claimed $55, and the agent was not willing to pay him more than $30, under the impression that the original price was $75. On the next morning, however, the agent met Rogers, pursuant to an appointment, and the result of that interview, and the understanding and agreement to which they then came, was that Rogers sent a receipt for $80, which embraced the $25 he had at first received, and the $55 which he claimed, and the agent upon receiving the receipt paid the $55. Now I think it is clear upon this state of facts, that it was mutually arranged, that Rogers was to have no further connection with the picture, and that it remained in his possession, after this understanding, simply as bailee ( *Whitehouse* v. *Frost*, 12 East, 614), to be delivered to Simms ; that if that understanding was not complete, in consequence of the dispute as to the original price, it became so at the interview

on the following morning; a conclusion which the court below were justified in drawing from the fact that Rogers a few hours afterwards sent the agent a receipt for the full amount which he claimed, and the agent took the receipt and gave the person who brought it the $55. In fact, the agent testifies that he had an appointment with Rogers that day at one o'clock, and instead of Rogers met the person by whom he had sent the receipt at that hour. It is from this testimony fairly inferable that he and Rogers had come to a conclusion in respect to the price at the interview that morning, which was at 10 o'clock, nearly three hours before the levy, and that this appointment at one o'clock was for the payment of the $55, which the agent, it would seem, paid without the slightest objection when the person came for it with the receipt. That the $55 was paid a few minutes after the picture was levied upon can make no difference. It was the prior agreement or mutual understanding that operated as a transfer of the property, there being nothing in the evidence to show that that was to depend upon the payment of the $55. It could not become the property of Simms, for he had bestowed no labor upon it, nor had it gone into his possession, and as Rogers had done all that he was to do to it, it remained in his possession after this understanding between the three parties only to be delivered to Simms for the plaintiff's benefit. Under the "special arrangement," as the agent calls it, which was made, there was no question as to Rogers' right to, or the agent's willingness to pay him the difference between the original price and what was thereafter to be paid to Simms. They differed only as to what the price was; and when that difference was settled by the agent's assenting to Rogers' view of the matter, as it may fairly be presumed that he did, upon the following morning, the clear intention from their mutual acts was that Rogers' connection with, right to, or claim to it, was at an end, and that Simms was to finish it for the plaintiff, and that the plaintiff was to pay Simms for what remained to be done to it. In my opinion, the right and title to it was thereafter in the plaintiff, for Rogers claimed no further right to it, except by way of lien for the amount agreed to be due for his work and labor upon the picture, and

Simms had no claim to the property, for he never had the possession of it. It was competent for the plaintiff, if he thought proper to do so, to relieve Rogers from the obligation to finish the picture, as he was about to sail for Europe, and accept an arrangement by which it was to be finished by another, the price which was to be paid for the work being apportioned between Rogers and Simms, in a way that was satisfactory to all parties. The effect of it was to discharge Rogers altogether, and leave the picture in its unfinished state at the plaintiff's risk, if Simms should not finish it, or if any casualty should happen to it, such as its destruction by fire, either before or after it went into Simms' hands to complete it—a risk or contingency which was for the plaintiff's consideration, and with which no one else had anything to do. It was, in fact, an unfinished picture thrown upon the plaintiff's hands by the artist who ought to have completed it, and the plaintiff, even if he saw fit to have it finished by another artist than Simms, could have done so, notwithstanding the arrangement made by his agent; Simms' claim, if he had any, being merely for the breach of an executory contract. In *Muckles* v. *Mangles* (*supra*), where the ship which was ordered to be built had been paid for, was finished, and the person's name who ordered it painted upon the stern, Heath, J., said, in holding that the property had not passed, it being still in the possession of the builder, that "a tradesman often finishes goods which he is making in pursuance of an order given by one person, and sells them to another, and that if the first customer has other goods made for him within the stipulated time, he has no right to complain, and cannot bring trover against the person who bought the goods." Chief Justice Abbot, in referring to this observation afterwards, says, that "Mr. Justice Heath's opinion appears to have been founded upon the notion that the owner was not tied down to deliver that specific barge, but would have been at full liberty to have substituted any other he was building, and the builder had done no act expressing an unequivocal consent that the general property should be vested in the purchaser" (*Woods* v. *Russell*, 5 B. & Ald. 942). But as the builder in *Woods* v. *Russell*, before the ship was completed, signed a cer-

tificate under which the person who ordered the vessel was entitled to register her in his own name, Chief Justice Abbot held that the title passed, and the correctness of the decision upon that ground, is conceded by Parker, J., and is not questioned by Denio, J., in *Andrews* v. *Durant* (*supra*). The acts of Rogers in this case are, in my judgment, quite as unequivocal as an indication of his intention and assent. The evidence is that upon the interview when the special arrangement was made, and they were all present, that he told Simms "to take the picture on the payment of twenty dollars, which the agent would pay him when it was completed," which was an unequivocal expression of his consent then and there that the picture was to go to Simms under the arrangement he had made with the plaintiff's agent. Moreover, the decision respecting the barge, in *Muckle* v. *Mangles* (*supra*) rested upon the recognized habits of tradesmen and the right of the builder to substitute another barge for the one he had built, and it has been several times referred to as supporting the view of the law taken in that case (*Atkinson* v. *Bell*, 8 B. & Cres. 277; *Johnson* v. *Hunt*, 11 Wend. 139). It can have little or no application to an article like the one ordered here, a copy of the likeness of the plaintiff's deceased child, which can scarcely be looked upon as that kind of vendible commodity which a tradesman having ready, disposes of to a customer who wants an article of the kind, and afterwards substitutes another of the like description in fulfillment of the order he has received.

As I have said, the fact that the $55 was not paid until after the picture was seized is immaterial, if there was before that an unequivocal assent, on the part of Rogers, that the property was to pass to the plaintiff; the non-payment of the amount claimed for what he had done, being material only where it appears that the party is to have the property if the money is paid (*Rhode* v. *Thwaits*, 6 B. & Cres. 388; *Olyphant* v. *Baker*, 5 Denio, 379; *Hammond* v. *Anderson*, 1 Bos. & P. N. S. 69).

The judgment should be affirmed.

ROBINSON, J.—While concurring in the result to which the

learned Chief Justice has arrived, I am of opinion that the title of the plaintiff to the picture in question originated in, and was necessarily established by, the contract made with the artist Rogers, for his employment, to reproduce in crayon the portrait of the plaintiff's child. The agreement was in no respect for the purchase from the artist of any such portrait as a chattel to be produced by him from materials to be furnished by him. The mere canvass and crayons he used were of insignificant and inconsiderable value, and were merely supplied by him as incidental or ancillary to his engagement to furnish the skill and labor necessary to produce the copy of the picture bargained for. The employment of the artist's skill constituted the very essence of the contract. The original, and all copies produced by him therefrom, presumptively belonged to the plaintiff, and such right could not be disputed by the artist whom he had employed for the furtherance of his own views, and for developing his property by enlarging its sphere of interest or usefulness. The contract in no way contemplated that the thing produced should be the subject of sale, as a commodity or article of merchandise; or that any materials used in its production should be the subject of purchase, or of its use in any way not subservient to the plaintiff's views and purposes. Its value consisted mainly "*in pretio affectionis*," of plaintiff for his child, and its ownership and right of use was manifestly intended throughout to be in the plaintiff, subject only to the enforcement of any lien for the work and labor performed, in case he failed in his duty to pay the artist his just compensation.

The law of intendment enters largely, and is to a great extent, controlling upon the question of ownership of personal property, and for the promotion of justice, is subtile in eliciting the true intention of the parties to the transaction—as to fixtures, whether chattels are attached to real estate with a view to its benefit and improvement, or for its temporary enjoyment (*Potter* v. *Cromwell*, 40 N. Y. 287; *Voorhees* v. *McGinnis*, 48 Ib. 278); as to articles produced or manufactured from materials furnished to a considerable extent by the employer (*Merritt* v. *Johnson*, 7 Johns. 473; *Johnson* v. *Hunt*, 11 Wend. 139); and as to whether the contract was one for the sale and

delivery of the article to be produced, or for work and labor (*Lee* v. *Griffin*, 1 Ell. Best & S. 272; *Clay* v. *Yates*, 1 Hurl. & G. 73; *Passaic Manufac. Co.* v. *Hoffmann*, 3 Daly, 495, and cases cited).

There is no ambiguity or room for doubt as to the contract in the present case being one for the employment of the skill and labor of the artist, or that the insignificant amount of materials used by him in or upon the copy portrait formed no basis for a legal claim for goods and merchandise sold or agreed to be sold, any more than that the paper or blank forms on which an attorney prepares a deed should be the subject of such a charge; nor but that such materials as were used were dedicated or appropriated to the production of the picture, and became a mere accessory to the contract of employment; while under the several contracts for the sale and delivery of a chattel to be produced by the vendor, and for work and labor in maturing and producing an article for the employer, separate and distinct remedies are afforded the vendor and employee or workman. Each of such remedies is entire and indivisible, and must be exclusively followed—as to goods agreed to be sold and delivered, the remedy being for the price of the thing sold; and that for work and labor being for the wages agreed to be paid or justly accruing.

The modes of enforcement of such rights and remedies are different in respect to the goods or chattels involved in the transaction—that of the vendor being to rescind and resume ownership, and to recover as damages the difference of market price, or, on notice, to resell the article; while that of the workman or employee exists simply in the enforcement of his lien.

In the former case, no title to the article passes to the vendee until delivery; in the latter, the title is throughout in the employer, subject only to the lien of the workman or laborer.

Under these views, the title to the copy portrait in question was, from the beginning, in the plaintiff, and the judgment should be affirmed.

LOEW, J., concurred in the opinion of DALY, Ch. J.

Judgment affirmed.